GEORGE BUCHANAN et al.

*v.*

REBA BUCHANAN et al.

[Submitted January 11th, 1908. Decided January 17th, 1908.]

1. Next of kin may enjoin misappropriation of decedent's personalty in the hands of a stranger before an administrator has been appointed.

2. By making defendant their witness complainants precluded themselves from impeaching her credibility, but not from establishing facts contradicting her testimony.

3. That complainants assert defendant's credibility by offering her as their witness does not require the court to accept her testimony as true as against complainants.

4. In a suit by next of kin to enjoin the disposition of personalty by a stranger, evidence *held* to show the personalty belonged to decedent and not to defendant.

5. Though fraud is not presumed and must be proved, it may be deduced from circumstances and conditions which afford strong presumptions of its existence.

On bill, answer, replication and proofs.

The bill is filed by the son and daughter of Dr. John Buchanan, deceased, as his next of kin and sole heirs-at-law. It avers that

defendant, while acting as clerk of Dr. Buchanan, in a business conducted by him under the name of Buchanan & Company, at and prior to his death, wrongfully appropriated to her own use the profits of the business as well as his entire estate, and that she now holds the same in her possession and under her control. The bill seeks to enjoin defendant from disposing of the property referred to.

The answer asserts that the business referred to in the bill, as conducted under the name of Buchanan & Company, was in fact the business of defendant, and that Dr. Buchanan had no interest therein; that the property now held by defendant is her individual property and has been acquired by her, in part, in the business referred to and in part as an artist and authoress; that Dr. Buchanan resided with her until his death and was an object of her charity, and that he died penniless.

*Mr. John W. Wescott,* for the complainant.

*Messrs. Carrow & Kraft,* for the defendant.

LEAMING, V. C.

It is urged in behalf of defendant that as no administrator of the estate of Dr. Buchanan has yet been appointed, this court should not, at the instance of the next of kin, exercise jurisdiction over any personal property which may have belonged to him at his decease. While it is true that personal property of a deceased intestate must pass to a personal representative and be distributed under order of court to the next of kin of deceased, it is not true that the next of kin are without interest in the protection of the property before an administrator is appointed. Where, as in this case, it is alleged by the next of kin that the personal property of a deceased intestate is being misappropriated by a stranger, it is the peculiar province of this court to protect the property and preserve its present status until an administrator shall have been appointed. To await the appointment of an administrator and an application by him to this court for the protection of the property, might, in many cases, result in the loss of the property. This court may, in such cases, ap-

propriately appoint a receiver to take possession of and protect the property in controversy. This was determined in *Flagler* v. *Blunt, 32 N. J. Eq.* (*5 Stew.*) *518,* where relief was sought by a creditor. A similar right on the part of the next of kin is supported in *Hansford* v. *Elliott, 9 Leigh 79;* see, also, *4 Pom. Eq. Jur.* § *1332.*

At the hearing complainants called defendant as their witness and examined her at great length. It is now urged, in behalf of defendant, that complainants are, in consequence, bound by her testimony so far as it is responsive to the questions asked. That is not the effect of calling an adverse party as a witness. By making defendant their own witness complainants were precluded from impeaching her credibility. That is, they could not offer evidence for the purpose of showing that she was unworthy of belief as a witness. But they were not precluded from introducing evidence to establish facts the contrary of facts to which defendant testified while testifying as complainants' witness. Such evidence would tend to discredit, and might entirely discredit and wholly destroy, the force of the evidence given by defendant and in that manner affect her credibility; but the rule of evidence which denies to parties the right to impeach their own witnesses does not prevent impeachment in that manner. The rule against impeachment denies the right to impeach the general reputation of the witness for truth, but does not deny the right to show that the whole or any part of the testimony of the witness is untrue. *1 Greenl. Evid.* §§ *442, 443; Skellinger* v. *Howell, 8 N. J. Law* (*3 Halst.*) *310; Ingersoll* v. *English, 66 N. J. Law* (*37 Vr.*) *463; Thorp* v. *Leibrecht, 56 N. J. Eq.* (*11 Dick.*) *499.* Nor does the fact that complainants assert the credibility of defendant in offering her as their witness in any way require the court to accept the testimony as true as against complainants. As is stated by Vice-Chancellor Van Fleet, in *Daggers* v. *Van Dyck, 37 N. J. Eq.* (*10 Stew.*) *130, 132,* and in *Second National Bank* v. *O'Rourke, 40 N. J. Eq.* (*13 Stew.*) *92, 94,* evidence, to be believed, must not only proceed from the mouth of a credible witness, but it must be credible in itself—such as the common experience and observation of mankind can approve as probable under the circumstances. In

the present case defendant's testimony must be weighed as other testimony is weighed, and it may be accepted in whole or in part or disregarded as its intrinsic merit shall appear when it is considered in the light of all the circumstances of the case. I dwell at this length upon this feature in view of the arguments made at the hearing and the extraordinary story related by defendant.

The value of the property, real and personal, which the evidence discloses to be now held by defendant, is not definitely shown, but it may be said to be about $15,000 or $20,000. Defendant claims that this property belongs to her. To account for the possession and ownership of this property, defendant relates the history of her life, which may be briefly outlined as follows: Until a young lady, she lived with Rece and Ann Hurff, at Roadstown, New Jersey, believing them to be her parents. Mrs. Hurff then disclosed to her that she was not her mother. Later, she went to live with Dr. Stitts, at Salem. While living there she learned that her real father was Dr. John Buchanan. In 1885, she went to New York City and there established the business of a manufacturing chemist and engaged in compounding and selling proprietary medicines under the business name of Buchanan & Company. Shortly thereafter she sent for Dr. Buchanan, who was then in Philadelphia, and in destitute circumstances, to come and make his home with her. From that time until his death Dr. Buchanan was supported by her in her home, first, in New York City and later in Brooklyn. At his death, January 20th, 1905, Dr. Buchanan had no property and was buried by defendant at her own expense. In her answer defendant accounts for the property which she has by the statement that it represents, in part, the profits from the business conducted by her under the name of Buchanan & Company, and in part, earnings by her as an artist and as an authoress. In her testimony she claims an additional source of revenue. She states that a heavily veiled woman would call upon her from time to time and present her money; that this woman claimed to be her mother and refused to permit defendant, at any time, to see her face or to know her name. The aggregate amount of the gifts received from this unknown woman is estimated by defendant at about $10,000. Defendant claims that the money so given to

her was invested by her in the capital stock of banks. She now holds, according to her testimony, stock in five several national banks of Philadelphia, which stock, she says, was purchased by her at various times named by her from 1898 to 1905, inclusive. The aggregate number of shares of bank stock disclosed by her is seventy. These shares, she says, are now locked up in a safe deposit vault in New York City, under the care of a retired gentleman by the name of J. C. Marshal, whose address she does not know, and who is now abroad. She says she has money deposited in four or five banks but can only name two. In the Cumberland National Bank, at Bridgeton, New Jersey, she has about $3,000 and in the Greenwich Bank, of New York City, about $500 or $600. Since the decease of Dr. Buchanan, defendant has purchased a residence in Bridgeton, New Jersey, for $4,500. She testifies that she has made considerable money from the sale of pictures painted by her. She claims to have learned to paint within the past fifteen years and to have sold many pictures. The second picture she painted she claims to have sold for $1,000. She cannot state to whom she has sold any of her paintings. She testifies also that she wrote and published a work called "The Germicide" and refers to this as another source of income. The work, produced by complainants as an exhibit, is a medical work covering over one thousand octavo pages. When examined touching her knowledge of the contents of the book she explained that it was largely copied from other medical works and not wholly written by her.

It is manifest that, if defendant's testimony is true, Dr. Buchanan died without property, and the property now controlled by defendant belongs to her. I am, however, unable to believe her statements. While the general story of her life may be within the bounds of possibilities, so many of her statements conflict and so many are otherwise manifestly untrue that it seems impossible to rely upon the most material parts of her testimony. The evidence offered in behalf of complainants entirely satisfies me that defendant is not the illegitimate daughter of Dr. Buchanan, but that she is the daughter of Mr. and Mrs. Rece Hurff. Daniel Hurff testifies that he was the second of nine children of Rece and Ann Hurff, and that defendant had always been

known in the family as the next younger child. They were reared together from childhood and until this trial he had never heard it questioned but that she was his own sister. His parents are now both dead, but he produced their family record of births and deaths in which defendant is recorded as the third born under date of November 2d, 1852. In view of the evidence thus offered it is impossible to believe that defendant's mother ever declared to defendant her illegitimacy, or that Dr. Buchanan ever claimed her as his child, or that an unknown woman ever claimed to be her mother and contributed $10,000 in the manner stated. The statements of defendant touching the medical publication are not only conflicting but are manifestly untrue. At first she claimed its authorship, while her later qualifications of that claim and her manner in testifying upon the subject would go far to satisfy anyone of her want of truthfulness. But, in addition, it is entirely apparent that defendant is not mentally qualified to write or even compile such a work, or to edit a medical pamphlet which was published by Buchanan & Company during the progress of that business. It is also difficult to accept defendant's testimony touching the revenues which she claims to have received from her paintings. She undoubtedly painted, but I am unable to believe that her paintings were a source of any considerable amount of revenue. I am entirely satisfied that defendant's source of revenue, and her only source of revenue, was from the business conducted under the name of Buchanan & Company, and that the property she now has represents the profits of that business. In this view the controlling question is whether that business belonged to her, as she claims, or whether it belonged to Dr. Buchanan, as claimed by complainants.

The evidence offered in behalf of defendant clearly establishes the fact of defendant's activity in the management of the business of Buchanan & Company. She appears to have had practically the entire charge of the business. She handled the cash and deposited it in bank to the account of Buchanan & Company and drew all checks against that account. Places where the business was at times conducted were rented by her. The expressman who shipped the products of the business testifies that he transacted all of his business with defendant. The evidence

shows that while Dr. Buchanan was usually in the place of business he was, as a rule, engaged in writing, though at times engaged in compounding remedies. Incident to the business there was also the publication of a medical pamphlet and current price-list. In this manner the business of Buchanan & Company was conducted, a business which included the manufacture and sale of proprietary medical remedies and the publication of current medical literature. It is impossible for me to believe that this business belonged to defendant. The circumstances of the case seem to forbid that belief, notwithstanding the important acts which defendant appears to have been permitted to perform in connection with the business which might indicate that she was its owner. She claims to have gone to New York and there established the business for herself, alone and without aid. If so, why did she then adopt the business name of Buchanan & Company? She was not known by the name of Buchanan and is now unable to give any satisfactory reason for the adoption of that business name. But far more important is the fact that it is impossible for me to believe that defendant was mentally capable of establishing that business. I do not think that anyone could have listened to her testimony and believed that she ever established or was able to have established the business of a manufacturing chemist or to have supplied the knowledge necessary for its maintenance. On the other hand, the ability of Dr. Buchanan in that line cannot be questioned. The various medical works of which he is the author attest an active and progressive intellect on his part. He was, at that time, under a cloud by reason of his conviction of crime in Philadelphia. His business prospects in that city were practically destroyed. That he should undertake the establishment of a business in New York was natural; that he should go there as an object of charity of defendant is, under the evidence, impossible of belief. I am convinced that the business of Buchanan & Company must have been established and maintained by the brains and skill of Dr. Buchanan, and that whatever the relation of defendant to that business may have been, it was not as its proprietor. The evidence, considered in the light of all the circumstances of the case, convinces me that the business was his. Defendant appears to have been trusted to almost

an unlimited degree in the affairs of the business. In view of his studious habits and advanced age, and the manifest necessity of his attention to the technical needs of the business, it is more or less natural that he should have entrusted defendant with the entire supervision of the accounts and cash. The result has been that at his death he is found penniless with defendant in affluence. From time to time during the progress of the business she has drawn money from the account where the moneys of the business were deposited and invested them for her own use as has already been shown, and fifteen days before his death, at a time when he was helpless, she closed out the account of Buchanan & Company and deposited the balance—then $2,000—in her own name as R. R. Russell. To that account she has deposited since his death over $13,000, and drawn out all but a balance of a little over $600. The conclusion forces itself upon my mind that she has been unfaithful to the trust reposed in her and has wrongfully appropriated to her own use the profits of a business which rightfully belonged to Dr. Buchanan, and that she should now account to the estate of Dr. Buchanan for the money thus wrongfully appropriated both before and since his death. I have thought that, perhaps, under the evidence, there might be grounds for the conclusion that Dr. Buchanan has advisedly acquiesced in all that defendant has done, but I am satisfied that, in view of his age and habits and surrounding circumstances, such a conclusion cannot be justified. Even a formal gift from him to her of all of his earnings, in view of their relations, would probably fall within that class of cases where independent counsel is necessary to support the act, as is exemplified in *Slack* v. *Rees, 66 N. J. Eq.* (*21 Dick.*) *447.*

It is earnestly urged in behalf of defendant that fraud is not to be presumed, but that it must be established by proofs. The rule is as stated by counsel, but positive and express proof of fraud is not required. Fraud may be deduced from circumstances and conditions which afford strong presumptions of its existence. It is not impossible for courts of equity to relieve against fraud which is established by presumptive evidence only. *1 Story Eq. Jur.* § *190; 3 Greenl. Evid.* § *254; Torrey* v. *Buck,*

*2 N. J. Eq. (1 Gr. Ch.) 366, 375.* .To my mind the evidence in this case justifies and requires the finding of fact here made.

I will advise a decree enjoining defendant from making any disposition of the property in her possession and under her control other than its surrender to an administrator of the estate of Dr. John Buchanan, when an administrator shall have been appointed.